# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| **FLORET IKOME,** | * |
| Plaintiff, | * |
| v. | *     Case No.: PWG-17-3407 |
| **CSRA, LLC,** | * |
| Defendant. | * |

* * * * * * * * * * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Floret Ikome, who "is from Cameroon and has very dark skin," helped his employer, Defendant CSRA, LLC ("CSRA"), win a contract with the Environmental Protection Agency ("EPA" and "Infrastructure contract") and became the Project Manager; two weeks later, CSRA replaced Ikome with CSRA employee Eric Toliver, an African-American with "significantly lighter skin." Compl. ¶ 15, ECF No. 2; Def.'s Mem. 4, ECF No. 44-1. Ikome filed a discrimination complaint with the Montgomery County Office of Human Resources ("OHR") and, shortly after, CSRA ended his employment by not assigning him another contract. Compl. ¶¶ 17–18; Def.'s Mem. 6. Ikome then filed suit against CSRA in the Circuit Court for Montgomery County, alleging discrimination based on color and national origin, as well as retaliation, in violation of Montgomery County Code § 27-1 *et seq.*; he also claims that CSRA violated Maryland Wage Payment Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501 *et seq.* when it failed to pay him the "capture bonus" he expected for winning the Infrastructure contract. Compl. ¶¶ 20–34, 35–40. CSRA removed the case to this Court, ECF No. 1, and filed the pending

motion for summary judgment. ECF No. 44.[1] Because Ikome offers direct evidence of discrimination, CSRA's motion is denied as to his discrimination claim. Ikome cannot prevail on his retaliation or MWPCL claims, however, and CSRA's motion is granted as to Counts Two and Three.

**Background**

Ikome began working for CSRA, which provides information technology services to government clients, as a Senior Director in July 2015. Compl. ¶¶ 7–8; Def.'s Mem. 3; Offer Ltr., ECF No. 47-3. Initially, he worked as the operations director on a contract for a client other than the EPA. Ikome Dep. 79:17–80:6, ECF No. 47-2; Def.'s Mem. 3. He voluntarily resigned from the project in about September 2016 and, for most of the remainder of 2016, he was "a casual employee (a status where an employee remains employed but is paid only for hours worked) and was not working on a bid or contract for CSRA." Def.'s Mem. 3; Ikome Dep. 133:7–134:20.

> Prior to 2017, the EPA had contracted with CSRA to perform IT services under a number of task orders. Eric Toliver, a long-term employee of CSRA and its predecessor companies, served as the Program Manager for certain of those EPA task orders. In late 2016, the EPA issued proposals for those task orders and others, all of which would be reorganized into three new EPA contracts, at the expiration of the prior contracts. still serving as the Program Manager, Mr. Toliver assisted with the "capture" work[2] for each of those contracts.
>
> CSRA ultimately bid on all three of the contracts, known as the high-end scientific computing contract, infrastructure support and application hosting

---

[1] The parties fully briefed the motion. ECF Nos. 44-1, 47, 51. A hearing is not necessary. *See* Loc. R. 105.6.

Plaintiff also filed an Interim Motion to Seal documents that CSRA has designated "Confidential" pursuant to the parties' Stipulated Protective Order, ECF No. 34. ECF No. 48. The motion does not comply with Loc. R. 105.11 and is denied. Given that the documents are documents that CSRA, not Ikome, designated as "Confidential," this denial is without prejudice to CSRA's ability to file a motion to seal within fourteen days of the date of this order, and the filings, ECF Nos. 49-1 – 49-4, will remain under seal in the interim.

[2] "Capture work is work undertaken in an effort to secure a contract." Toliver Decl. ¶ 6, ECF No. 44-14.

2

> contract ("Infrastructure"), and end-user services contract ("EUS"). The EUS contract was the highest priority for CSRA because it was the greatest dollar value of the three and CSRA believed it had the highest win probability. . . . CSRA made the decision to select Mr. Toliver as the Program Manager for the EUS bid. . . .
>
> . . . CSRA needed to find an individual to be bid as the Program Manager for the lower-priority Infrastructure contract. Plaintiff, who was still on casual status and not working on a bid or contract for CSRA at the time, was . . . identified for that position, well after the capture and proposal efforts were already underway.

Def.'s Mem. 3–4 (citations omitted); *see* Pl.'s Opp'n 6.

At the end of March 2017, CSRA won the Infrastructure contract but not the EUS contract. Def.'s Mem. 5. William Balcke, one of Ikome's supervisors, Pl.'s Opp'n 7, informed Ikome on April 13, 2017 that he no longer would be working as the Program Manager on the Infrastructure contract, because CSRA wanted to replace him with Eric Toliver. Ikome Decl. ¶ 15, ECF No. 47-1; Balcke Dep. 105:8–17, ECF No. 50-3. Ikome offers evidence that, in the same meeting, "Mr. Balcke also made a statement about people in North Carolina being 'rednecks', which [Ikome] understood to mean that the reason for the decision to replace [him] was that said 'rednecks' are racist," and it "would be more acceptable" for them to have Toliver, who has lighter skin, "in the top post on the Infrastructure [EPA] contract." Ikome Decl. ¶ 15; *see also* Ikome Dep. 165:20–21. Defendants refute this evidence with Balcke's testimony that he did not make such a statement. *See* Balcke Dep. 106:15–20.

Plaintiff's counsel sent a demand letter to Paul Nedzbala, Executive Vice President of the Health and Civil Group at CSRA, on April 19, 2017, alleging race and national origin discrimination in CSRA's decision to replace Plaintiff with Eric Toliver." Pl.'s Opp'n 11; *see* Apr. 19, 2017 Ltr. from Pl.'s Counsel to Nedzbala, ECF No. 47-5. CSRA informed Ikome that "he would be returned to casual status and subject to discharge if he did not locate an alternate position." Def.'s Mem. 5–6. Specifically, on April 25, 2017, CSRA notified Ikome that "he could

charge his time to an indirect charge code for two weeks and had the option to maintain his employee status without pay for 30 days thereafter before he would be terminated if he did not find another position at CSRA." Pl.'s Opp'n 4; *see* Def.'s Mem. 16–17; Apr. 25, 2017 Email from Sellers to Ikome, ECF No. 44-7, at 3).

Ikome filed a discrimination complaint with OHR on May 15, 2017. Compl. ¶ 3; Def.'s Mem. 6. On June 30, 2017, at which point Ikome had not secured another position, CSRA terminated his employment. Compl. ¶ 4; Def.'s Mem. 6. He filed a second OHR complaint, Compl. ¶ 4, and then filed this suit in the Circuit Court for Montgomery County on October 2, 2017, *id.* at 1. He claims that CSRA discriminated against him based on color and national origin when it replaced him with Toliver on the Infrastructure contract, and that it then retaliated against him for filing the May 15, 2017 ORH complaint, by terminating his employment on June 30, 2017. *Id.* ¶¶ 23, 30–31. He views these acts as violations of Montgomery County Code § 27-1 *et seq.* Ikome also claims that CSRA violated the MWPCL when it failed to pay him a "capture bonus" that he expected for winning the Infrastructure contract. Compl. ¶¶ 20–34, 35–40.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id*.

## Count One – Discrimination

Ikome claims discrimination in violation of Montgomery County law. "Maryland courts construe [discrimination] claims [under the Montgomery County Human Rights Act] similarly to those made under Title VII," *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016), and "it is appropriate to consider federal precedents when interpreting state and local laws," *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n.8 (Md. 2007). The elements of a claim for race or national origin discrimination under Title VII or Montgomery County Code are "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees outside the protected class." *Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, No. JKB-10-276, 2011 WL 4549177, at *5 (D. Md. Sept. 28, 2011) (citing *White v. BFI Waste Servs.,* 375 F.3d 288, 295 (4th Cir. 2004)); *see also Coleman*, 626 F.3d at 190. A plaintiff may prove discrimination using direct evidence or under the *McDonnell Douglas*[3] burden-shifting approach. *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526–27 (D. Md. 2015), *aff'd as modified,* No. 15-2067, 2016 WL 4750626 (4th Cir. Sept. 13, 2016); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284 (4th Cir. 2004). "Under either avenue of proof, the focus is on whether a reasonable juror could conclude that illegal discrimination was a

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

5

motivating factor in the employment decision." *U.S. Equal Employment Opportunity Comm'n v. Dimensions Healthcare Sys.*, No. PX-15-2342, 2016 WL 4593470, at *3 (D. Md. Sept. 2, 2016) (citing *Sawicki v. Morgan State Univ.*, No. WMN-03-1600, 2005 WL 5351448, at *6 (D. Md. Aug. 2, 2005), *aff'd*, 170 F. App'x 271 (4th Cir. 2006)).

"Direct evidence must be 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Va. Union Univ.,* 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted)). Stated differently, "[t]o constitute direct evidence, statements must be directly related to the employment decision in question" and must be "'the most blatant remarks, whose intent could be nothing other than to discriminat[e].'" *Betof v. Suburban Hosp., Inc.*, No. DKC-11-1452, 2012 WL 2564781, at *6 (D. Md. June 29, 2012) (quoting *Signal v. Gonzales*, 430 F. Supp. 2d 528, 541 n.5 (D.S.C. 2006) (citation omitted)). The statement must be one that, "[i]f believed, . . . 'would prove the existence of a fact . . . without any inference or presumptions,'" such as an explicit statement "that an impermissible consideration was a determining factor." *Id.* (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (internal quotation marks omitted), *rev'd on other grounds*, 517 U.S. 308 (1996)).

The facts in *Price Waterhouse v. Hopkins* are illustrative. 490 U.S. 228 (1989), *superseded by statute on other grounds as stated in Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir. 1994). There, Hopkins filed a sex discrimination suit after she was proposed, but not selected, for partnership at the accounting firm where she worked as a senior manager. *Id.* at 231–33. The existing partners weighed in on the decision, and it was "Hopkins' perceived shortcomings

in th[e] important area" of interpersonal relations that "doomed her bid for partnership," which was put on hold and then not reconsidered. *Id.* at 232, 234–35. The Supreme Court noted that "[t]here were clear signs" in the comments the partners provided "that some of the partners reacted negatively to Hopkins' personality because she was a woman," with "[o]ne partner describ[ing] her as 'macho'; another suggest[ing] that she 'overcompensated for being a woman'; [and] a third advis[ing] her to take 'a course at charm school.'" *Id.* at 235 (citations to record omitted). Additionally, when "[s]everal partners criticized her use of profanity . . . , one partner suggested that those partners objected to her swearing only 'because it's a lady using foul language.'" *Id.* (citation to record omitted). Of most significance was one partner's advice to Hopkins when he explained to her why her bid for partnership was on hold: "in order to improve her chances for partnership," he suggested that she "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Id.* (citation to record omitted). The Supreme Court concluded that these facts were sufficient direct evidence of sex discrimination, reasoning:

> Hopkins proved that Price Waterhouse invited partners to submit comments; that some of the comments stemmed from sex stereotypes; that an important part of the Policy Board's decision on Hopkins was an assessment of the submitted comments; and that Price Waterhouse in no way disclaimed reliance on the sex-linked evaluations.

*Id.* at 251.

Here, it is undisputed that, on April 13, 2017, Mr. Balcke informed Ikome that he no longer would be working as the Program Manager on the Infrastructure contract with the EPA, because CSRA wanted to replace him with Eric Toliver. Ikome Decl. ¶ 15, ECF No. 47-1; Balcke Dep. 105:8–17. As noted, Ikome offers evidence that, in the same meeting, "Mr. Balcke also made a statement about people in North Carolina being 'rednecks', which [Ikome] understood to mean

that the reason for the decision to replace [him] was that said 'rednecks' are racist," and it "would be more acceptable" for them to have Toliver, who has lighter skin, "in the top post on the Infrastructure [EPA] contract." Ikome Decl. ¶ 15; *see* Ikome Dep. 165:20–21 (stating that Balcke "did mention that a lot of people down in North Carolina are rednecks," and Ikome believed that Balcke meant "[t]hat there are people who are racist down there and it's better to replace me with somebody that's more acceptable with them"). *But see* Balcke Dep. 106:15–20 ("Q. Mr. Balcke, during this conversation with Mr. Ikome, did you make a comment something to the effect that the people in that area were rednecks? A. I don't recall that. . . . and I certainly wouldn't talk about my clients that way.").

CSRA insists that courts have "rejected [the term redneck] as being discriminatory in nature." Def.'s Reply 1 & n.1. None of the case law Defendant cites—from the Northern District of Texas, the District of South Carolina, the Western District of Arkansas, and the District of the District of Columbia, *see id.*—is controlling authority. And, as anyone who has listened to the lyrics of Randy Newman's famously satirical song "Rednecks" knows, in common parlance, the term "redneck" often connotes racism. And, the Oxford English Dictionary identifies two slang uses for "redneck":

> Originally: a poorly educated white person working as an agricultural labourer or from a rural area in the southern United States, typically considered as holding bigoted or reactionary attitudes. <u>Now also more generally: any unsophisticated or poorly educated person, *esp.* one holding bigoted or reactionary attitudes</u>.

Redneck, Oxford English Dictionary, https://www.oed.com/view/Entry/160404?redirectedFrom= redneck#eid (last visited July 15, 2019) (emphasis added).

In the alternative, CSRA argues that the reference to "rednecks" was "an isolated, stray remark [that] is not sufficient evidence of discrimination." *Id.* at 2. I agree that an isolated, stray remark would not provide sufficient evidence of discrimination to withstand a motion for summary

8

judgment, but I disagree that, as presented in Ikome's deposition testimony and Declaration, the remark at issue is a stray remark. In this regard, CSRA relies on *Lewis v. Home Sales Co.*, No. RDB 09-1153, 2011 WL 826352, at *4 (D. Md. Mar. 7, 2011), and *Escobar v. Montgomery Cty. Bd. of Educ.*, No. AW-99-1964, 2001 WL 98600, at *6 (D. Md. Feb. 1, 2001), Def.'s Mem. 8–9, both of which are readily distinguished from the case before me.

In *Lewis*, noting that "an isolated, stray remark will not be deemed direct evidence of discrimination," this Court concluded that the African-American plaintiff "ha[d] not alleged any direct evidence of [race] discrimination," when his direct supervisor, Mike King, referred to race but a higher-up supervisor, Todd Hamlett, terminated his employment. 2011 WL 826352, at *4 (citing *Escobar*, 2001 WL 98600). It reasoned:

> At most, Lewis claim[ed] that during his disagreement with King [who was Caucasian] in July 2006, King accused Lewis of "play[ing] the race card." As an initial matter, this comment does not rise to the level of a stray remark of discrimination as it shows that King did *not* want their discussion to be about Lewis's race. Furthermore, there is no link between King's comment and Hamlett's decision to terminate Lewis as it is undisputed that King played no role in Lewis's termination.

*Id.* (citations to record omitted). And, in *Escobar*, the plaintiff had testified that one of the defendants asked her "if she needed a translator," which the Court held was, "alone, . . . not enough to show direct evidence of discriminatory intent" because "[s]tray remarks will not be deemed direct evidence of discrimination." 2001 WL 98600, at *6.

*Escobar*, in turn, cites *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). There, the Fourth Circuit observed, with regard to age discrimination:

> While derogatory remarks may be direct evidence of . . . discrimination, *see Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429, 1433 (4th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986), the decisional law "clearly reflects that isolated and ambiguous statements ... 'are too abstract, in addition to

being irrelevant and prejudicial, to support a finding of age discrimination,' "
*Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) (quoting
*Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 268 n. 2 (6th Cir.), *cert. denied,* 480
U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987)). Discriminatory remarks
concerning age, therefore, cannot be stray or isolated statements. According to the
Seventh Circuit, "[u]nless the remarks upon which plaintiff relies were related to
the employment decision in question, they cannot be evidence of a discriminatory
discharge." *McCarthy v. Kemper Life Ins. Co.,* 924 F.2d 683, 686–87 (7th
Cir.1991). As this court has opined, there must be some "nexus ... between the
alleged discriminatory statements and *any* of the employment decisions made by
the [employer]." *Clay Printing Co.,* 955 F.2d at 942; *see also Figures v. Board of
Pub. Utils.,* 967 F.2d 357, 360–61 (10th Cir.1992) (noting that racial comments are
not probative of discrimination unless they are linked to the challenged action);
*Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990) (holding
that certain statements unconnected to the employment decision-making process
are simply stray remarks that do not demonstrate discriminatory intent).

*O'Connor*, 56 F.3d at 548–49. Thus, when the statement that the plaintiff offers has a discriminatory nature and is "related to the employment decision in question," it is not a stray remark, and it may be direct evidence of discrimination. *See id.*

Here, although it does not appear to have been Balcke who made the decision to remove Ikome from the Infrastructure contract with the EPA, *see* Ikome Dep. 166:6–15 (stating that Balcke "made clear that he was not thrilled about what he was telling [Ikome], that Kevin Connell talked with him and Kevin had promised to call [Ikome]. But Kevin never did"), Balcke made the comment about rednecks at the same time he informed Ikome that he would no longer be working on the project in North Carolina. Thus, viewed in the light most favorable to Ikome, the statement is neither "isolated and ambiguous" or "stray," because a link exists between Balcke's comment and the decision to remove Ikome from the project: It (at least as Ikome understood it) was made to justify the decision. *O'Connor*, 56 F.3d at 548–49. Therefore, it is direct evidence of discriminatory intent that creates a genuine dispute of material fact and defeats CSRA's motion

for summary judgment as to Count One.[4] *See id.*; 2011 WL 826352, at *4; *Escobar*, 2001 WL 98600, at *6. CSRA's motion is denied as to Count One. *See* Fed. R. Civ. P. 56(a).

**<u>Count Two –Retaliation</u>**

In his Complaint, Ikome claims that CSRA retaliated against him, in violation of Montgomery County Code, once: when it terminated his employment on June 30, 2017, one and a half months after he filed a discrimination complaint with OHR on May 15, 2017. Compl. ¶¶ 3–4, 30–31. As CSRA sees it, in Ikome's deposition, he asserted two other instances of retaliation: "In his deposition, Plaintiff also linked his replacement by Mr. Toliver to his filing of the Charge and further averred that his manager was told not to interact with him as a result of the Charge." Def.'s Mem. 16–17 (citing Ikome Dep. 55, 242-43, 246-47, ECF No. 44-3). It is true that Ikome testified in his deposition that his manager Paul Bautista "told [him] that after [Ikome] filed [his] lawsuit, he had been instructed that he should not deal with [Ikome]." Ikome Dep. 55:5–10; *see also id.* at 246:16–247:6. Then, in his Opposition, Ikome alleges that CSRA's "certainty" in "finding [him] a 'permanent position' . . . changed immediately after Plaintiff's counsel sent a demand letter to Paul Nedzbala on April 19, 2017, alleging race and national origin discrimination in CSRA's decision to replace Plaintiff with Eric Toliver," after which, according to Ikome, "Defendant immediately deployed a tactical team to neutralize Plaintiff while it instructed others not to communicate with him at all." Pl.'s Opp'n 11.

Significantly, as noted, in his Complaint, Ikome only claims that CSRA retaliated against him for filing his OHR complaint on May 15, 2017, and that it retaliated by terminating his

---

[4] Because I find that this genuine dispute of material facts creates a triable issue on direct evidence, I need not address Defendant's argument that, under the *McDonnell Douglas* analysis applicable when there is no direct evidence of discriminatory animus, it had a legitimate, non-discriminatory reason for removing Ikome from the Infrastructure contract.

employment. Compl. ¶¶ 30–31.  "While the Federal Rules of Civil Procedure establish a liberal pleading standard, they do 'not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 359 (D. Md. 2011) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006)).  To the contrary, "a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Id.* at 360 (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009)).  Accordingly, I will consider only Ikome's claim that CSRA retaliated against him for filing his OHR complaint on May 15, 2017, and that it retaliated by terminating his employment.  *See id.*; *see also Wahi*, 562 F.3d at 617.

This Court evaluates Montgomery County Code retaliation claims, like discrimination claims, the same as claims brought pursuant to Title VII. *Tinoco v. Thesis Painting, Inc.*, No. GJH-16-752, 2017 WL 52554, at *5 (D. Md. Jan. 3, 2017) (quoting *Whittaker v. David's Beautiful People, Inc.*, No. DKC 14-2483, 2016 WL 429963, at *2 n.2 (D. Md. Feb. 4, 2016) (citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 504 (2007))). When, as here, there is no direct evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). First, the employee "must . . . establish a prima facie case by showing: (i) 'that [he] engaged in protected activity,' (ii) 'that [his employer] took adverse action against [him],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity.'" *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds as stated in Foster*, 787 F.3d at 249). If the employee establishes a prima facie case, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).

Finally, "[i]f the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Hill*, 354 F.3d at 285 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000))). This framework allows a plaintiff

> to prove causation even without direct evidence of retaliatory animus: If a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination. *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

*Id.*

The standard for demonstrating causation as part of a prima facie case of retaliation and the standard for establishing pretext "are not identical." *Id.* at 252. While an employee trying to prove pretext must show that "the real reason for [her] termination was her employer's retaliation," or, stated differently, that she "would not have been terminated but for her employer's retaliatory animus," *id.*, "the burden for establishing causation at the prima facie stage is 'less onerous,'" *id.* at 251 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)).

It is undisputed that Ikome engaged in protected activity by filing a discrimination claim with OHR on May 15, 2017, and CSRA took an adverse employment action when it terminated his employment approximately one and a half months later, on June 30, 2017. Compl. ¶¶ 3–4; Def.'s Mem. 2, 6. Thus, the only issue at the first step in the *McDonnell Douglas* framework is whether a causal link existed between the two events.

As noted, it "is not an onerous burden" to prove causality for purposes of establishing a prima facie case. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 335–36 (4th Cir. 2018)

(citing *Foster*, 787 F.3d at 251; *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation." (citation omitted))). "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989); *Burgess*, 466 F. App'x at 282).

CSRA does not contend that it was not aware of Ikome's May 15, 2017 charge, or dispute that it terminated his employment on June 30, 2017, about one and a half months later. Nor does it assert that the termination lacked the temporal proximity to establish a causal relationship. Rather, what it argues that is causation is lacking because on May 15, 2017, almost three weeks *before Ikome filed his first OHR complaint* (the only protected activity he alleged in his Complaint), CSRA notified him that he would be paid for another two weeks, could take leave for thirty days after that, and that his employment would end after the thirty-day leave period if he did not secure another position. Def.'s Mem. 17–18; *see* Sellers Decl. ¶¶ 3–4 & Ex. E-1 (Apr. 25, 2017 Email), ECF No. 44-7; *see also id.* Ex. E-2, ECF No. 44-7, at 4 (May 11, 2017 Email from Sellers to Ikome, stating that it was "imperative that [he] use the 30 days to secure an alternative position").

In *Francis v. Booz, Allen & Hamilton, Inc.*, the Fourth Circuit concluded that, "[w]hile temporal proximity between a complaint and an adverse employment action can, in some cases, be used to survive summary judgment, it does not suffice" when the actions leading to the termination of employment "began *before* [the employee's] protected activity, belying the conclusion that a reasonable factfinder might find that [the employer's] activity was motivated by

[the employee's] complaints." 452 F.3d 299, 309 (4th Cir. 2006). The Fourth Circuit observed that the Second Circuit has held that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise," *id.* (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)), and the First Circuit has noted that "conduct that occurs both before and after the event leading to the alleged retaliation cannot form the basis of a Title IX retaliation claim," *id.* (citing *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 67 (1st Cir. 2002)). And, in *James v. Verizon*, this Court observed that "[a]lthough there was a close temporal proximity between the time when Plaintiff announced that she would be on [FMLA] leave (September 11), and the date she was informed of her termination (September 22), mid-September is also when Plaintiff's PIP period came to an end." 792 F. Supp. 2d 861, 867–68 (D. Md. 2011), *aff'd*, 458 Fed. App'x 262 (4th Cir. 2011). It concluded that, under those circumstances, no inference of improper motive arose because "the temporal proximity between Plaintiff's leave status and her termination [wa]s fully accounted for by non-invidious motivations and circumstances" and there was no other evidence of retaliatory animus. *Id.*; *see also Myles-Anderson v. Emmes Corp.*, No. GJH-15-2461, 2017 WL 881812, at *4 (D. Md. Mar. 3, 2017) (concluding that the plaintiff "failed to establish a causal connection between her protected activity and her termination because she ha[d] not 'adduce[d] any admissible evidence to suggest a connection between [her] complaints about alleged workplace discrimination and [her] eventual termination,'" given that "the actions that led to Plaintiff's termination began *before* her [protected activity]").

Ikome argues that, notwithstanding the history that CSRA establishes, which he does not dispute, *see* Pl.'s Opp'n 4, there is evidence to establish a causal connection between his protected

15

activity and the termination of his employment because Ikome first complained of discrimination on April 19, 2017, before CSRA warned of his possible termination on April 25, 2017. Pl.'s Opp'n 11–12; *see* Apr. 19, 2017 Ltr. from Pl.'s Counsel to Nedzbala. But, as noted, Ikome failed to allege in his Complaint that he engaged in protected activity when his counsel sent the April 19, 2017 letter; nor did he seek leave to amend to add this allegation. Thus, given that CSRA notified him before he filed his OHR complaint that his employment would end if he did not secure another position, Ikome cannot prevail on his retaliation claim based on the termination of his employment as retaliation for filing his OHR complaint. *See Francis*, 452 F.3d at 309; *Myles-Anderson*, 2017 WL 881812, at *4; *James*, 792 F. Supp. 2d at 867–68. Summary judgment is granted in CSRA's favor on Count Two. *See* Fed. R. Civ. P. 56(a).

### **Count Three – MWPCL**

Ikome claims that CSRA violated the MWPCL because it was obligated, but failed, to pay him a "'capture bonus,' [also called a win team bonus] in the amount of approximately $60,000" for "leading the team that secured the $267 Million EPA Contract"; he insists that the capture bonus qualifies as a wage under the MWPCL. Compl. ¶¶ 38–39. CSRA agrees that, pursuant to the MWPCL, CSRA was obligated to pay Ikome "all wages due." Def.'s Mem. 22 (quoting Md. Code Ann., Lab. & Empl. § 3-505). But, in its view, the capture bonus "does not constitute a wage owed to him because he was not eligible to recover such a bonus." *Id.* According to CSRA, "Plaintiff participated in and received payment pursuant to an incentive compensation plan in 2015-2017," *id.* at 22–23, and an employee is not eligible for a capture bonus while he is "participat[ing] in other corporate incentive program[s]." *Id.* at 22. It is true that the CSRA Win Team Bonus Program Guidelines, effective April 1, 2016, provide that, "[t]o be eligible for a Win Team Bonus, employees . . . cannot currently participate in other corporate incentive program

16

(including EICP, GICP, or PMICP)." CSRA Win Team Bonus Program Guidelines, ECF No. 44-7, at 5, 6. Thus, the issue is whether, despite this policy, CSRA was obligated to pay Ikome a capture bonus.

Plaintiff argues that "it is industry practice to pay the bonus to key persons on a winning contract, regardless of their participation in other incentive compensation plans," and that, as "a long-time and high-level performer in the competition for government contracts," he "was well aware of this industry norm and expected to receive such a bonus if he was successful in bringing in this large contract to CSRA." Pl.'s Opp'n 7 (citing Ikome Decl. ¶ 20 (stating industry practice); Ikome Dep. 28–29 (stating that he received capture bonuses at two previous companies), 248–49 (asserting that he could "speak to the plans" that CSRA had for capture bonuses, without having seen them, because "CSRA is not unique in any way of the standard practices"), 252:14–253:8 (stating that "never in [his] 20 or so years of IT ha[s] [he] seen a situation where the program manager actively involved in writing the proposal doesn't get a capture bonus")). But other than his own statements, Ikome has not offered any evidence of industry standards.

In any event, a common practice in the industry that his own employer did not adhere to and Ikome's own expectations do not give rise to an obligation for CSRA to pay a capture bonus. Rather, the signed Offer Letter, with its provisions for Ikome's salary and sign-on bonus, Offer Ltr., ECF Nos. 44-12, 47-3, is an employment contract and governs the employer's payment obligations. *See Lehner v. ProSource Consulting LLC*, No. GLR-18-858, 2018 WL 6395539, at *4 (D. Md. Dec. 6, 2018) ("[T]he Employment Contract is indeed a valid and enforceable contract. The offer letter was ProSource's offer, Lehner's signature shows his acceptance, and the $140,000.00 salary and $10,000.00 Signing Bonus are adequate consideration. *See Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 477 (D. Md.), *aff'd*, 730 F. App'x 177

17

(4th Cir. 2018) (noting that under Maryland law, contract formation requires an offer, acceptance, and consideration).").

> "The fundamental rule in the construction and interpretation of contracts is that the intention of the parties as expressed in the language of the contract controls the analysis." *Ford v. Antwerpen Motorcars Ltd.*, 117 A.3d 21, 25 (Md. 2015) (quoting *Curtis G. Testerman Co. v. Buck*, 667 A.2d 649, 654 (Md. 1995)). Maryland follows the law of objective interpretation of contracts, which gives plain meaning to the unambiguous language of the agreement. *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 632 (Md. 2003). This type of interpretation considers "what a reasonably prudent person in the same position would have understood as to the meaning of the agreement." *Cochran v. Norkunas*, 919 A.2d 700, 710 (Md. 2007) (citing *Walton v. Mariner Health*, 894 A.2d 584, 594 (Md. 2006)).

*Lehner*, 2018 WL 6395539, at *4.

Notably, the offer letter states in unambiguous language Ikome's salary, sign-on bonus, and eligibility to participate in CSRA's Individual Incentive Compensation plan; it does not mention capture bonuses. *See id.* Consequently, a reasonably prudent person would not have understood it to have provided for a capture bonus. *See Lehner*, 2018 WL 6395539, at *4; *Cochran*, 919 A.2d at 710. Moreover, the absence of a reference to the capture bonus, where it would be expected to be mentioned if available to Ikome, is evidence that it was not a part of his contract. *See* Fed. R. Evid. 803(7).

Certainly, Ikome asserts that "three different managers, Ben Geissman, Paul Bautista, and William Balcke, told Plaintiff that he would get a capture bonus for working on a winning contract bid." Pl.'s Opp'n 7 (citing Ikome Decl. ¶¶ 15, 23, 24; Ikome Dep. 167:11–14, 249:11–12 (testifying that Balcke said that "he's gonna make sure that [Ikome] get[s] [his] capture bonus"), 250:4–15 (testifying that Bautista "was clear that obviously if [Ikome was] part of [a bid opportunity that won, he] would get a capture bonus")). But, because all of the statements were made after his hire and were not a part of the unambiguous employment contract, they were not a

18

part of the agreement and they are inadmissible to alter its meaning. *See Berhane v. Allstate Ins. Co.*, No. PJM 13-1713, 2013 WL 5960891, at *3 (D. Md. Nov. 6, 2013) ("Maryland law 'does not permit contracts to be reformed or otherwise ignored merely because of uncommunicated mental reservations entertained by one of the parties at the time it was executed. And as a matter of substantive law, parol[ ] evidence ordinarily is inadmissible to vary, alter or contradict a contract . . . that is complete and unambiguous, in the absence of fraud, accident or mutual mistake.'" (quoting *Bernstein v. Kapneck,* 430 A.2d 602, 606–07 (Md. 1981)). Likewise, Toliver's testimony "that he also participates in the IIC plan but the reason he did not receive a capture bonus on the Infrastructure contract was because he was not part of the key personnel on the capture team as Plaintiff was," Pl.'s Opp'n 7–8 (citing Toliver Dep. 112-13, ECF No. 50-4), is not proof that Plaintiff was entitled to a capture bonus. *See Berhane*, 2013 WL 5960891, at *3.

Additionally, when asked whether he "received any formal communication from the company indicating that [he] could participate in the capture bonus at CSRA," Ikome admitted that he did not. Ikome Dep. 251:5–9. Further, as for Ikome's testimony that Balcke informed him that he would receive a capture bonus, he also admitted that he did not know whether Balcke knew at the time of that conversation that Ikome was a participant in CSRA's individual incentive compensation plan, which would make him ineligible for the capture bonus. Ikome Dep. 170:18–171:10. Thus, on the record before me, the capture bonus simply was not a part of Ikome's employment agreement.

Ikome also argues that "CSRA informed Plaintiff that he would participate in the Individual Incentive Compensation (IIC) plan" without "advis[ing] him that such a designation would make him ineligible for the industry-standard capture bonus," and "the IIC program documents do not mention ineligibility for the capture bonus." Pl.'s Opp'n 7 (citing Ikome Decl. ¶ 22; Ikome Dep.

19

78–79, 261:1–6 (testifying that the document describing the incentive compensation plan did not "say you are not eligible for capture bonus")). But, as noted, eligibility for a capture bonus was not an established benefit that CSRA had to take affirmative steps to eliminate when it tendered Ikome his offer letter; the plain language of his employment contract, which offered participation in the Individual Incentive Compensation plan, but not the capture bonus, governs. *See Lehner*, 2018 WL 6395539, at *4; *Cochran*, 919 A.2d at 710. Moreover, the CSRA Win Team Bonus Program Guidelines in effect at the time CSRA won the Infrastructure contract with the EPA provide that, "[t]o be eligible for a Win Team Bonus, employees . . . cannot currently participate in other corporate incentive program (including EICP, GICP, or PMICP)." CSRA Win Team Bonus Program Guidelines 5. Therefore, Ikome was not eligible for a capture bonus, and CSRA was not obligated to provide him with one. *See id.*; *See Lehner*, 2018 WL 6395539, at *4; *Cochran*, 919 A.2d at 710. Summary judgment is granted in CSRA's favor on Ikome's MWPCL claim. *See* Fed. R. Civ. P. 56(a).

## **ORDER**

Accordingly, it is, this 19th day of July, 2019, hereby ORDERED that Defendant's Motion for Summary Judgment, ECF No. 44, IS DENIED as to Count One and GRANTED as to Counts Two and Three. Additionally, the Motion to Seal, ECF No. 48, IS DENIED without prejudice to CSRA's ability to file a motion to seal within fourteen days of the date of this order, and the filings, ECF Nos. 49-1 – 49-4, will remain under seal in the interim.

I will schedule a call to set a date for trial as to Count One.

/S/
Paul W. Grimm
United States District Judge